# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

**DEEDRA LORRAINE HUGHES,**
**N/K/A THOMPSON,**

      **Plaintiff,**

**vs.**                        **CIVIL ACTION NO. 2:17-CV-01983**

**NANCY A. BERRYHILL,**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

      **Defendant.**

## <u>PROPOSED FINDINGS AND RECOMMENDATION</u>

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered March 24, 2017 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Motion for Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (Document Nos. 17 and 20.)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for judgment on the pleadings (Document No. 17.), **GRANT** Defendant's request to affirm the

decision of the Commissioner (Document No. 20.); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

## Procedural History

The Plaintiff, Deena Lorraine Hughes, now known as Deena Lorraine Thompson (hereinafter referred to as "Claimant"), protectively filed her applications for Titles II and XVI benefits on September 6, 2013, alleging disability since December 1, 2009[1], because of "lupus, depression, diabetic, high blood pressure, high cholesterol, arthritis, and sleep apnea". (Tr. at 199-200, 201-209, 222.) Her claims were initially denied on February 7, 2014 (Tr. at 113-123, 124-134.) and again upon reconsideration on April 7, 2014. (Tr. at 137-143, 144-150.) Thereafter, Claimant filed a written request for hearing on June 4, 2014. (Tr. at 151-152.)

An administrative hearing[2] was held on October 6, 2015 before the Honorable Tierney Carlos, Administrative Law Judge ("ALJ"). (Tr. at 38-56.) On December 18, 2015, the ALJ entered a decision finding Claimant had not been under a disability at any time from July 4, 2012 through the date of the decision. (Tr. at 16-37.) On February 18, 2016, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 14-15, 285-286.) The ALJ's decision became the final decision of the Commissioner on January 26, 2017 when the Appeals Council denied Claimant's Request. (Tr. at 1-6.)

On March 23, 2017, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.) The Commissioner

---

[1] Claimant subsequently amended her alleged onset date to July 4, 2012. (Tr. at 217.)
[2] The undersigned notes that the transcript of the entire hearing is not complete due to technical issues that arose during the hearing. (Tr. at 40.) There is no transcript of the swearing in of Claimant or of the ALJ's initial questioning of her. Claimant also notes this anomaly but raises issues in this appeal that "are not reliant on [Claimant's] missing testimony. (Document No. 17 at 3.)

filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 10 and 11.) Subsequently, Claimant filed a Brief in Support of Judgment on the Pleadings (Document No. 17.), in response, the Commissioner filed a Brief in Support of Defendant's Decision. (Document No. 20.), to which Claimant filed her Reply. (Document No. 21.) Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was 49 years old as of the amended alleged onset date, and considered a "younger person" but changed age categories to "person closely approaching advanced age" by the date of the ALJ's decision. See 20 C.F.R. §§ 404.1563(c) and (d), 416.963(c) and (d). (Tr. at 30.) Claimant has a high school education. (Tr. at 223.) She last worked on December 1, 2009 as a nursing assistant in a nursing home where she would provide care for patients that included lifting them when necessary. (Tr. at 222, 223, 230.)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from

a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture

of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1).[3] Fourth, if the claimant's impairment(s) is/are

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years'

deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

**Summary of ALJ's Decision**

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through March 31, 2015. (Tr. at 21, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the amended alleged onset date of July 4, 2012. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant had the following severe impairments: degenerative disc disease; peripheral neuropathy; major depressive disorder; pain disorder; narcissistic personality disorder; obesity; and obstructive sleep apnea. (Id., Finding No. 3.) At the third inquiry, the ALJ

---

inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20

C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 23, Finding No. 4.) The ALJ then found that

Claimant had the residual functional capacity ("RFC") to perform light work:

> except she can only occasionally climb ramps or stairs, stoop, and crouch. The
> claimant can never climb ladders, ropes, or scaffolds, kneel, and crawl. She can
> frequently balance. The claimant can never be exposed to unprotected heights. She
> cannot operate a motor vehicle. The claimant is limited to occasional exposure to
> humidity and wetness. She must have no exposure to dust, odors, fumes, pulmonary
> irritants, extreme cold and extreme heat. She is limited to occasional contact with
> the public.

(Tr. at 25, Finding No. 5.)

At step four, the ALJ found Claimant was unable to perform any past relevant work. (Tr.

at 30, Finding No. 6.) At the final step, the ALJ found that in addition to the immateriality of the

transferability of job skills, Claimant's age, education, work experience, and RFC indicated that

there were jobs that exist in significant numbers in the national economy that Claimant could

perform. (Tr. at 30-31, Finding Nos. 7-10.) Finally, the ALJ determined Claimant had not been

under a disability from July 4, 2012 through the date of the decision. (Tr. at 31, Finding No. 11.)

**Claimant's Challenges to the Commissioner's Decision**

Claimant asserts two main errors in support of her appeal.

First, Claimant argues that the ALJ erred in his RFC assessment by discrediting Claimant's

need to use a hand held assistive device that had been prescribed by her treating physician, where

no other medical source of record found she did not require an ambulatory assistive device, which

renders his step five analysis lacking substantial evidence. (Document No. 17 at 6-10.) By finding

Claimant's need for a cane or walker unnecessary, the ALJ improperly supplanted his lay opinion

in lieu of medical expert opinion, which found there was a necessity when writing the prescription

for the assistive devices. (Id. at 10-11.) The ALJ compounded this error when he ignored the vocational expert's opinion that in consideration of Claimant's use of a hand held assistive device to walk or stand, Claimant would be incapable of substantial gainful activity. (Id. at 11-12.) Therefore, at step five, the Commissioner failed to carry her burden of proof that Claimant was capable of other work. (Id. at 12.)

As for her second alleged ground in support of her appeal, Claimant argues that the ALJ erred in evaluating her credibility by not considering all the factors required pursuant to the Regulations to support his analysis, and insufficiently considered a couple of factors. (Id. at 12-15.) Further, the ALJ relied on selective objective evidence to discredit Claimant's subjective complaints and the record as a whole shows that Claimant lacks the capacity to function at any RFC level on a continual basis as required in competitive substantial gainful activity. (Id. at 16-17.)

Claimant asks the final decision be reversed and that benefits be awarded to her, or in the alternative, that the case be remanded for the correction of errors below. (Id. at 18.)

In response, the Commissioner argues that Claimant did not prove that her cane was "medically required" as defined under Social Security Ruling 96-9p for it to have an effect on her RFC, and numerous courts within this Circuit have held claimants to a high burden to provide the appropriate documentation. (Document No. 20 at 13-14.) Furthermore, the ALJ reviewed at length the evidence in his determination as to whether Claimant's prescribed hand held assistive device was medically necessary; simple acceptance of the prescriptions for the devices is not the legal standard. (Id. at 14-16.) The Commissioner also contends that the ALJ was not required to discuss every piece of evidence in the record, but he did carefully consider all the relevant evidence of

record with regard to Claimant's use of a cane or walker, and her argument to the contrary is akin to asking this Court to re-weigh the evidence. (Id. at 16-17.) Substantial evidence supports the ALJ's finding that Claimant's assistive devices were not medically required. (Id. at 17.)

Next, the Commissioner argues that the ALJ's credibility analysis complied with the Regulations as well as controlling case law in this Circuit. (Id. at 17-18.) The Commissioner points out that the Fourth Circuit has not enunciated any format that should be used in finding a claimant's testimony incredible, and that an ALJ need only provide logical reasons grounded in substantial evidence to explain the weight given to a claimant's allegations regarding the intensity, persistence and limiting effects of symptoms. (Id. at 18-19.) The objective medical evidence, the conservative treatment and Claimant's activities of daily living did not support her statements of subjective complaints. (Id. at 19-20.)

Moreover, the ALJ's credibility analysis was not entirely based on the objective medical evidence, Claimant was treated conservatively, with physical therapy, medication, diabetic shoes and orthotics, surgery was not indicated, she was encouraged to be more active and continue with weight loss, all of which belies the severity of her condition. (Id. at 20.) Claimant also demonstrated no side effects from her medications. (Id.) In addition to the medical evidence, the ALJ noted Claimant's activities of daily living did not correspond to her allegations of subjective complaints. (Id. at 21.)

Finally, the Commissioner asserts that Claimant's alleged mental complaints were not substantiated by either the medical evidence or her activities, particularly where the evidence was minimal and that she only began treatment a few months prior to the ALJ's decision. (Id. at 21-22.) The ALJ's RFC generously provided that Claimant have only occasional contact with the

public, and appropriately found that the record did not credibly support her alleged mental limitations. (Id. at 22-23.)

The Commissioner states that her final decision is supported by the substantial evidence and asks this Court to affirm. (Id. at 23.)

In reply, Claimant reasserts that the medical evidence showed that her hand held assistive devices were medically necessary; Claimant demonstrated an antalgic gait, had back pain and neuropathy, all of which supported the necessity of such devices. (Document No. 21 at 1-2.) Claimant argues that the ALJ's rejection of her treating physician's opinion that her patient needed the assistive device did not comply with the Regulations: there was no persuasive contrary evidence cited in order to justify not giving this opinion controlling weight, only the ALJ's presumption that is contrary to legal standards. (Id. at 2-3.) Further, the ALJ's presumption was nothing more than his substituted lay opinion. (Id. at 3.) The vocational expert's testimony confirmed that the use of the prescription hand held assistive device was a critical factor at step five that would have ruled out all jobs Claimant could perform. (Id.)

Claimant disputes that the ALJ did a proper review of the factors in his credibility assessment, and that he based his determination on his interpretation of the objective medical evidence. (Id. at 4-5.)

Claimant renews her request that the final decision be reversed for an order awarding benefits, or that this Court remand this case for the correction of the errors made below. (Id. at 6.)

**The Relevant Evidence of Record**[4]

---

[4] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

**Medical Records Concerning Physical Impairments**

<u>Unity HealthCare:</u>

Claimant transferred her care to Unity on June 27, 2012. (Tr. at 650.) During a July 5, 2012 appointment, she complained of heel spurs; x-rays were ordered and she was referred to podiatry. (Tr. at 648.) She was told to be more active, with a goal of 30 minutes per day; Claimant was thinking about joining a sports team or fitness class. (<u>Id</u>.) She returned for complaints of heel pain in September; she was given prednisone and custom orthotics. (Tr. at 646.) By November, her pain was much improved by steroids, and examination revealed no clubbing, cyanosis, or edema. (Tr. at 643.)

In February 2013, Claimant returned with forms from Social Security. (Tr. at 639.) complained of headaches from not having taken her blood pressure medication in the last three weeks, she also complained of generalized joint pain. (Tr. at 640.) She reported that prednisone helped, and wanted a refill of ibuprofen. (<u>Id</u>.) On examination, she had normal motor function and sensation. (<u>Id</u>.)

Claimant returned in March 2013 to discuss RSA services and the possibility of going back to work, although she had applied for disability and was awaiting a decision. (Tr. at 635.) It was noted that she had not seen the provider in the "past 8 months" and did not get her bloodwork done, follow up with the mammogram, colonoscopy or the foot x-ray referrals. (Tr. at 636.) She reported feeling well, as she had been taking her blood pressure medication daily. (<u>Id</u>.)

By April 2013, Claimant continued to report that she had been "feeling fine": a

musculoskeletal examination was normal to inspection; she was non-tender to palpation; and had a full range of motion. (Tr. at 628, 630.) It was noted that she had seen the podiatrist, that she made diet changes, started walking for exercise and had lost forty pounds in the last month. (Tr. at 630.) She was prescribed ibuprofen for joint pain, and advised to walk three times per week for fifteen to twenty minutes. (Tr. at 631.) By June 2013, Claimant was losing weight and walking three to four times per week for exercise. (Tr. at 619.) She reported feeling well. (Id.) In September 2013, Claimant saw Sarah Kureshi, M.D., who examined her and found no clubbing, cyanosis, or edema. (Tr. at 614.) She complained of generalized joint pain and had a positive ANA test, but other labs were negative. (Id.) Claimant reported feeling depressed and eating more because she recently found out that her husband had been cheating on her and she wanted to move back home to West Virginia. (Tr. at 613.) Dr. Kureshi provided counseling to Claimant. (Tr. at 613, 615.) Claimant also requested assistance filling out disability forms. (Tr. at 612, 616.)

Boone Memorial Hospital:

Beginning in March 2014, Claimant treated with nurse practitioner Melanie Harper Allen (Tr. at 319.) Claimant was new to the area, and was out of medication for three weeks. (Tr. at 319, 321.) On examination, she had mild edema, nodules on her feet, and an unsteady gait. (Tr. at 320.) Nurse Allen provided a prescription for a quad cane based on a diagnosis of neuropathy, rheumatoid arthritis, and heel spurs. (Tr. at 708.) Claimant returned in April with multiple complaints, primarily left flank pain, and a request for refills. (Tr. at 323, 324.) She walked with a cane. (Tr. at 324.) Nurse Allen requested at CT scan to rule out kidney stone and instructed Claimant that if the pain worsened to go to the ER. (Tr. at 326.) The CT scan revealed a 7.6 cm diameter cystic and solid mass in her mid to lower region of the left kidney; a urologic consultation

was considered. (Tr. at 330.)

On May 1, 2014, Claimant was seen by John H. Mani, M.D. at the Kanawha Urology Associates, on referral from Dr. Amy Sayre. (Tr. at 409-412.) On examination, she walked with a normal gait and ambulated without difficulty. (Tr. at 411.) Her extremities had normal range of motion and no edema. (Tr. at 412.) Dr. Mani advised that further CT evaluation or possibly an ultrasound examination would be necessary, however, the left renal calculus "is tiny and will not require any treatment at this time." (Id.)

Beginning in March 2014, Claimant treated with Jamie Hall, D.P.M., on referral from Nurse Allen at the Boone Clinic. (Tr. at 679.) Claimant complained of numbness, tingling, and burning, but examination revealed full 5/5 muscle strength in the bilateral lower extremities, no edema or erythema, but pain in the plantar medial calcaneal tubercle of the bilateral heels. (Tr. at 680.) She was given a night splint and home stretching exercises, as well as a prescription for diabetic shoes "to help prevent ulceration with the neuropathy and deformities that are present." (Id.) Claimant followed up on May 27, 2014: though she rated her pain at "10" that day with numbness tingling and burning to both feet, it was also noted that she was doing stretches and wearing night splints and "seems to be improving." (Tr. at 677.) She ambulated on her own accord; had 5/5 muscle strength; but complained of pain at the plantar calcaneal tubercle of the bilateral heels; in addition to diabetes and Haglund's deformity, Claimant was assessed with neuropathy. (Tr. at 678.) She was instructed to continue with the splint, diabetic shoes, and medication and to follow up in three weeks. (Id.)

Periodically from March 2014 through September 2015, Claimant also visited the Boone Memorial Hospital emergency room on several occasions for various complaints, including flank

pain, flu symptoms, and dizziness. (Tr. at 332, 458, 493, 500, 573, 725.) Her musculoskeletal examinations at these visits showed no spinal tenderness, full range of motion, no musculoskeletal deficits, normal motor function, and intact sensation (Tr. at 375-376, 498, 501.), although at one visit on September 26, 2015, she had an unsteady gait. (Tr. at 741.) On that day, she was complaining of chest pain, dizziness, generalized weakness, and abdominal pain, and admitted for observation. (Tr. at 740, 744.) At her discharge on October 1, 2015, activity was encouraged, and a referral to an urologist due to a renal mass; it was noted that she had seen Dr. Mani in the past. (Tr. at 725.)

In January and July 2015, Claimant presented to the emergency room with complaints of hip and low back pain. (Tr. at 458, 573.) Her January examination revealed intact range of motion, intact circulation, intact sensation, and a normal compartment syndrome examination. (Tr. at 458.) In July, Claimant had limitations on range of motion in the left and right hip due to pain, painful range of motion in the back with all movement, but no tenderness or muscle spasm. (Tr. at 574.) X-rays of the lumbar spine and hip in January showed mild to severe degenerative changes (Tr. at 464-466.); similar findings were seen on CT scans in July. (Tr. at 480-481.)

Consultative Examination Report:

On January 16, 2014, Claimant attended a physical consultative examination with Deidre Parsley, D.O. (Tr. at 312-318.) Claimant reported knee pain, but indicated that she never had injections or surgery, though she takes ibuprofen 800 mg twice a day as needed. (Tr. at 313.)

On examination, Claimant walked with a limping gait that was not unsteady, lurching, or unpredictable. (Tr. at 314.) She ambulated with the use of a cane, but was able to ambulate during the examination without one. (Id.) She appeared stable at station and comfortable in the sitting and

supine positions. (Id.) Her legs had no tenderness, redness, warmth, swelling, fluid, laxity, or crepitus of the knees, ankles or feet with the exception of tenderness of the anterior knees and swelling and crepitus of the bilateral knees. (Tr. at 316.) The dorsolumbar spine had normal curvature; no evidence of paravertebral muscle spasm; no tenderness to percussion of the dorsolumbar spinous process; normal straight leg raising test; no hip tenderness, redness, warmth, swelling, or tenderness. (Id.)

She was unable to stand on either leg, but could bend forward at the waist to 90 degrees, with lateral bending of the spine to 30 degrees bilaterally. (Id.) Muscle strength was 5/5 (normal), with no evidence of atrophy. (Id.) She had decreased sensation to light touch, pinprick, and vibration of the bilateral feet, right worse than left. (Id.) Hoffman and Babinski's signs were negative. (Id.) She was unable squat or walk on the heels, and could walk on the toes only a few steps and only with use of the cane. (Id.) She was able to perform tandem gait, but only with use of a cane. (Id.) Dr. Parsley noted impairment in squatting, stooping, standing, and walking; with likely impairment in the ability to lift, carry, push, and pull heavy objects; mild impairment in vision; and no impairment in bending, sitting, hearing, speaking, or traveling. (Tr. at 318.) She did not indicate one way or another that Claimant required the use of a cane for ambulation or balance.

Treatment of Achilles Tendon with Podiatrist Carrie Gosselink, D.P.M.:

Claimant also treated with podiatrist Carrie Gosselink, D.P.M., from December 2014 through August 2015 for complaints of bilateral heel pain. (Tr. at 532, 534, 536, 538, 540, 562.) At these appointments, examination showed full muscle strength (5/5), but tenderness to palpation along the posterior Achilles interaction of the foot bilaterally, with thickening to the tendon bilaterally and no evidence of rupture. (Tr. at 533, 535, 537, 539.) Imaging studies showed a large

plantar and plantar calcaneus spurs, but no acute fracture or dislocation. (Tr. at 533.) Dr. Gosselink noted mild spurring bilaterally to the Achilles tendon, left worse than right. (Tr. at 537, 540, 562.) Claimant presented with a cane in December 2014 and February 2015, and with a walker in April 2015, May 2015, June 2015, and August 2015. (Tr. at 532, 534, 537-538, 540, 562.)

Dr. Gosselink prescribed modalities including custom orthotics and diabetic shoes, physical therapy,[5] medication, injections, a night splint, a brace, and compound cream. (Tr. at 533, 535, 539, 541). However, Claimant did not receive her topical cream or wear the brace due to discomfort. (Tr. at 537.) In April 2015, Dr. Gosselink provided a fiberglass cast to both legs and instructed Claimant to continue using Mobic as prescribed and her walker for support; she was to return in four weeks for re-evaluation and cast removal. (Tr. at 537.) Upon her return in May, Claimant reported spasms throughout her lower extremities and ambulates with her walker wherever she goes; she noted intermittent improvement with use of the cast to rest her Achilles tendon. (Tr. at 538.) She received injections in her feet that she tolerated well. (Tr. at 539.) Claimant returned in June for re-evaluation; she again reported intermittent improvement with the casts. (Tr. at 540.) She continued to complain of pain in her feet, with her left worse than her right, and exhibited 5/5 muscle strength bilaterally. (Id.) It was noted that her pain was mainly systemic resulting from lupus and she was to discontinue Mobic; Voltaren and Celebrex were started and she was directed to continue wearing her diabetic shoes and orthotics. (Tr. at 541.)

State Agency Medical Consultants:

On February 4, 2014, Subhash Gajendragdjar, M.D. reviewed the record and opined that

---

[5] Claimant underwent physical therapy in early 2015. (Tr. at 437-457, 467-485.) She complained of chronic bilateral heel pain and lower extremity pain, as well as back pain and difficulty bending. (Tr. at 451, 478.) With therapy, her quality of gait with the quad cane improved. (Tr. at 485.)

Claimant could perform a range of light work, with the ability to stand and/or walk for six hours in an eight-hour day; sit for about six hours in an eight-hour day; and certain postural and environmental limitations. (Tr. at 73-75, 83-85.) On April 5, 2014, Thomas Laudeman, D.O. reviewed the record, and agreed with Dr. Gajendragdjar's opinion. (Tr. at 95-96, 105-106.) Neither physician opined that Claimant required an assistive device.

Amy Sayre, M.D., Treating Physician:

Claimant began treatment with primary care physician Amy Sayre, M.D., in July 2014. (Tr. at 519.) Claimant needed a new family doctor and was currently filing for disability. (Id.) Claimant stated that her family was tired of her "mooching" from them and that her electricity had been turned off. (Id.) She complained of pain, mostly in her feet. (Tr. at 515.) On examination, her extremities were without clubbing, cyanosis, or edema; her gait was slow and she walked with a cane, but climbed onto the exam table without much difficulty. (Tr. at 521.)

Claimant returned for follow-ups on four occasions; at one appointment, she presented with a tender left foot; on another occasion, she had an antalgic and unsteady gait and used a cane; and at another appointment, she had decreased spinal range of motion and tenderness and used a walker. (Tr. at 512, 515, 592.) On April 1, 2015, Dr. Sayre provided a prescription for a wheeled walker due to lower back pain and neuropathy. (Tr. at 710.) Dr. Sayre also ordered a lumbar MRI, showing degenerative changes and mild congenital spinal canal stenosis. (Tr. at 525-526.) A neurosurgical consult was advised. (Tr. at 526.)

Consultative Examination with Robert Crow, M.D.:

On June 19, 2015, Claimant saw neurosurgeon Robert J. Crow, M.D., for complaints of chronic low back and bilateral leg symptoms with lumbar spondylosis. (Tr. at 529.) Examination

showed that Claimant was well-developed, in no acute distress, and comfortable. (Tr. at 530.) Her gait was normal, with excellent toe and heel walking. (Id.) She came in with a walker, but was able to ambulate independently a few steps with a very awkward wide-based, but not spastic, gait. (Id.) She had normal range of motion on flexion and extension; normal tone; no midline percussible pain, no trigger points, and no spasm; and negative straight leg raise and cross straight leg raise tests. (Id.) Motor, sensory, and deep tendon reflex examinations were intact and symmetric in the bilateral lower extremities. (Id.) Dr. Crow reviewed Claimant's films, which did not indicate surgical intervention was necessary. (Tr. at 531.) Instead, Dr. Crow recommended physical therapy and referral to a pain specialist. (Id.)

**Medical Records Concerning Mental Impairments**

Angela Null, M.S., Psychological Consultative Examiner:

On December 23, 2013, Claimant underwent a mental consultative examination with Angela Null, M.S. (Tr. at 304-308.) Claimant's allegations of chronic pain were the primary focus of clinical attention, though she also reported depressive symptoms "off and on" for three to four years. (Tr. at 305.) She denied any mental health treatment. (Id.) Claimant reported going to the store and running errands twice per month; attending medical appointments at least once every three months; attending church once or twice per week; visiting friends and family occasionally; talking on the telephone twice per week, and attempting to walk for exercise. (Tr. at 308.) She had four close friends. (Id.) She performed light cooking, laundry, dishes, sweeping, and mopping. (Id.)

On mental status examination, Claimant was generally cooperative, with direct eye contact; logical and coherent speech; orientation to person, place, date, and time; euthymic mood and mild

constricted affect; connected and logical thought processes; no evidence of delusions, paranoia, obsessions, compulsions, or unusual perceptual experiences; intact judgment and insight; normal psychomotor behavior; no past or current suicidal or homicidal ideation or intent; intact recent memory; mildly deficient recent and remote memory; moderately deficient concentration; intact persistence; normal pace; and mildly deficient social functioning. (Tr. at 307.)

State Agency Psychological Consultants:

In January and April 2014, John Todd, Ph.D., and Jeff Boggess, Ph.D., reviewed the record and opined that Claimant had no restriction of activities of daily living or in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation, each of extended duration. (Tr. at 72, 82, 93-94, 103-104.) They opined that her mental impairments were non-severe. (Id.)

Prestera Center:

Claimant did not begin mental health treatment until August 18, 2015, several years after her alleged onset date of disability. (Tr. at 682.) At her initial intake, Claimant was diagnosed with major depressive disorder, recurrent, mild, and narcissistic personality disorder. (Tr. at 686-687.) One month later, Claimant returned for counseling, noting that she had never treated for mental illness, and just started individual therapy last month. (Tr. at 688.) She reported getting along well with people and having the "gift of gab." (Id.) Mental status examination revealed an appropriate appearance; normal eye contact; cooperative, pleasant attitude; normal motor activity; normal speech; appropriate affect; no suicidal or homicidal thoughts; logical thought processes; appropriate thought content; full orientation; intact concentration and calculation; average intelligence; and fair insight and judgment. (Tr. at 689.) She reported seeing things out of the

corner of her eyes and hearing people talking and music playing faintly. (Tr. at 690.) Claimant was prescribed Seroquel, told to continue individual therapy, and to return in one month. (Tr. at 692.)

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that due to pain, she could only stand or walk for about five minutes at one time. (Tr. at 43.) She indicated that she asked her primary care provider if there was something she could do to help with her balance, and Dr. Sayre prescribed her a cane, that Medicaid paid for. (Tr. at 43-44.) Later, Dr. Sayre prescribed Claimant a walker. (Tr. at 44.)

Claimant stated that she is able to drive (Tr. at 247.), and attends church four to six times per month. (Tr. at 45.) She has home health care provided by Panhandle Services, which employs her ex-daughter-in-law to come in five days a week to help with housework, dressing or bathing if Claimant needs help; she also takes out the trash once or twice per week. (Tr. at 46.) Claimant sees her grandchildren a couple of times per week, cares for her cat, shops for groceries with a ride-on cart, prepares her own meals, dusts, washes dishes, does light housekeeping, washes laundry, reads, and watches television. (Tr. at 48, 246-249.)

Nancy Shapero, Vocational Expert ("VE") Testimony:

The VE classified Claimant's past work as a caregiver and nursing assistant. (Tr. at 50-51.) The ALJ then provided a hypothetical question where an individual of Claimant's age, education, and vocational experience could perform light work; occasionally climb ramps and stairs, stoop, and crouch; never climb ladders, ropes, or scaffolds, kneel, or crawl; frequently balance; never be exposed to unprotected heights; no operating a motor vehicle; occasionally be exposed to weather and humidity; never be exposed to odors, fumes, extreme cold, or extreme heat; and have

occasional contact with the public, but unlimited contact with supervisors and coworkers. (Tr. at 51.) The VE testified that such an individual could perform the jobs of assembler, price marker, and hand bander. (Tr. at 51-52.) Under sedentary work, the VE testified that such an individual could perform jobs such as addresser, assembler, and inspector. (Tr. at 52-53.)

In response to questioning from Claimant's counsel, the VE testified that the prescribed use of a cane and/or a walker for assistance with standing or ambulation would foreclose jobs at light work level. (Tr. at 54.) The VE testified further that if such an individual were required to take up to three 20-minute unscheduled breaks during the day for fatigue due to medications or to symptoms, and if the breaks were above and over the regularly scheduled breaks or lunch break, then the individual would not be able to perform the jobs, if that were on a continual basis. (Id.)

## Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are

rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." <u>Blalock</u>, 483 F.2d at 775.

## Analysis

As previously stated, Claimant argues the ALJ erred in his RFC assessment because he failed to give proper credit to her treating source prescriptions for hand-held ambulatory assistance devices, but instead relied on his own opinion that her cane or walker were not medically necessary, and ultimately found her not disabled at the fifth and final step in the sequential evaluation process. (Document No. 17 at 6-12.)

<u>The RFC Assessment:</u>

Residual functional capacity represents the *most* that an individual can do despite his limitations or restrictions. <u>See</u> Social Security Ruling 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC determination is an issue reserved to the Commissioner. <u>See</u> <u>Id</u>. §§ 404.1527(d), 416.927(d).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

<u>Diaz v. Chater</u>, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

Of interest to this case, the SSA issued Social Security Ruling 96-9p providing further guidance when the issue of hand-held assistive devices arises:

**Medically required hand-held assistive device:** To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

See, *Titles II and XVI: Determining Capability to do Other Work--Implications of a Residual Functional Capacity For Less Than a Full Range of Sedentary Work*, SSR 96-9p, 1996 WL 374185, at *7. (**bold** in original)

With respect to Claimant's use of the hand held assistive devices, the ALJ noted several references in the decision, beginning with Claimant's testimony. Claimant testified that she can stand or walk about five minutes before needing to sit down and that she used a cane for about two years that had been prescribed by Dr. Sayre. (Tr. at 26.) "She stated she asked the doctor if there was something she could use to help her balance and Medicaid paid for the cane." (Id.) Further, Claimant testified that Dr. Sayre prescribed a walker for her earlier that year. (Id.)

Regarding the medical evidence of record, the ALJ noted that on March 6, 2014 that Melanie Harper Allen, APRN-BC "wrote the claimant a prescription for a quad cane", and compared this to Dr. John Mani's findings that Claimant exhibited a normal gait and she denied back pain during his examination on May 1, 2014. (Tr. at 27.) Dr. Mani also observed Claimant had "normal range of motion of upper and lower extremities". (Id.) Next, the ALJ noted that on May 27, 2014, Jamie Hall, DPM stated [Claimant] ambulated on her own and demonstrated 5/5 muscle strength in her bilateral lower extremities. (Id.) "However, the claimant then presented to Amy Sayre, M.D., on July 2, 2014, and walked slowly with a cane", that she was seeking disability

and that she climbed onto the examination table "without much difficulty." (Id.) The ALJ next noted that on April 1, 2015 Dr. Sayre wrote Claimant a prescription for a wheeled walker "due to diagnoses of low back pain and neuropathy." (Id.)

The ALJ observed that Claimant "apparently requested prescriptions for a cane and walker from Dr. Sayre", but "the objective findings of record are not supportive of the necessity for such assistive devices, even when considering the impact of obesity." (Id.) Again, the ALJ compared the findings reported by Dr. Crow during his neurologic examination on June 19, 2015, that Claimant's "gait was normal, with excellent toe and heel walking." (Id.) During Dr. Crow's examination, Claimant's low back range of motion was normal, Claimant's straight leg raise and cross straight leg raise testing were negative, and her motor examination was intact and symmetric in the bilateral lower extremities, with normal tone. (Id.) Further, Dr. Crow noted Claimant's deep tendon reflexes were intact, symmetric at the knees and ankles, without pathologic reflexes and that her pulses were palpable in both feet. (Id.) The MRI did not suggest that Claimant was a surgical candidate. (Id.) Dr. Crow advised her to continue with physical therapy and referred her to a pain specialist and that a follow up appointment was not scheduled. (Id.)

Following the discussion of the medical evidence regarding Claimant's physical impairments, her allegations and testimony of same, the ALJ summarized the physical RFC assessment:

> The record is overall consistent with finding the claimant capable of performing light exertion with the restrictions as identified. The evidence, including the objective findings noted by Dr. Crow during the neurological evaluation, indicates the claimant's conditions are treated effectively and conservatively with primarily medication, despite her allegations to the contrary. This reflects poorly on the claimant's credibility regarding the severity of her condition. In addition, there is no evidence that the claimant experiences side effects of any medication that would interfere with her ability to perform work activity.

(Tr. at 28.)

With respect to the opinion evidence, the ALJ considered the consultative examination by Dr. Parsley, and gave it little weight, noting that Dr. Parsley "did not list definitive functional limitations" and that it was inconsistent with her own objective findings. (Tr. at 29.) Again, the ALJ compared Dr. Parsley's findings with the findings of Dr. Crow, *supra*. (Id.) Next, the ALJ considered the September 25, 2013 opinion of Dr. Kureshi, noting that she indicated Claimant's chronic foot pain made it difficult for her to walk or stand for extended periods, and that Claimant's conditions prevented her from working, though she "noted she was unsure of the duration." (Id.) Though the ALJ acknowledged Dr. Kureshi "was a treating source", he found her limitations inconsistent with the overall record, again, referencing "a specialist (neurologist)" [Dr. Crow] who more recently determined Claimant had a normal gait and normal range of motion in her lumbar spine. (Id.) Further, the ALJ determined that Claimant's activities of daily living suggested that she functioned at a higher level than Dr. Kureshi found, and again found that Claimant was capable of light work within the limitations established by the RFC. (Id.) Finally, with respect to Claimant's physical impairments, the ALJ considered the September 20, 2013 opinion provided by Kevin E. Jefferson, DPM, who like Dr. Kureshi, opined that because of chronic foot pain and pain medication, Claimant was unable to stand or walk for extended periods, or stoop, climb, or lift and carry heavy objects. (Id.) Once again, the ALJ gave this opinion "little weight", finding "no definitive limitations given" for the opinion, and that it was "based more on the claimant's subjective complaints." (Id.) The ALJ again referred to Dr. Crow's neurological evaluation findings that Claimant exhibited a normal gait and that "the objective findings of record during numerous physical examinations" supported the conclusion that Claimant was capable of light

work. (Id.)

The undersigned is mindful that SSR 96-9p applies to claimants capable of less than a full range of sedentary work, but also that "district courts within the Fourth Circuit consistently rely on it for guidance when a claimant alleges that a hand-held assistive device was not properly considered in his or her RFC determination." Schnurpel v. Berryhill, No. 2:16-CV-06042, 2017 WL 2390548, at *13 (S.D.W. Va. Apr. 17, 2017), adopted by 2017 WL 2389396 (S.D.W. Va. June 1, 2017) (citing cases). The pertinent jurisprudence provides that an assistive device, such as a cane or walker, must be medically "required" for it to affect a claimant's RFC. Joines v. Colvin, No. 3:14-CV-00396-MOC, 2015 WL 1249597, at *6 (W.D.N.C. Mar. 18, 2015) (emphasis in original).

The Commissioner has argued "[e]ven if an assistive device such as a cane or walker is prescribed, it does not necessarily follow that it is 'medically required' as defined in the regulations." Joines, 2015 WL 1249597, at *6; Morgan v. Comm'r, Soc. Sec., No. JKB-13-2088, 2014 WL 1764922, at *1 (D. Md. Apr. 30, 2014); Timmons v.Colvin, No. 3:12-CV-609, 2013 WL 4775131, at *8 (W.D.N.C. Sept. 5, 2013); Wimbush v. Astrue, No. 4:10-CV-00036, 2011 WL 1743153, at *3 (W.D. Va. May 6, 2011) ("Thus, even if a cane is prescribed, it does not necessarily follow that it is medically required.").[6] (Document No. 20 at 14.) Moreover, the Commissioner points out that Claimant "must provide documentation from an accepted medical source establishing the need for an assistive device in addition to describing the circumstances for which it is needed" in accordance with SSR 96-9p, *supra*. (Id.) Finally, where a "claimant fails to supply appropriate documentation, the ALJ need not include the use of an assistive walking device in the

---

[6] See, also, Eason v. Astrue, 2:07-CV-00030, 2008 WL 4108084, at *16 (E.D. N.C. Aug. 29, 2008).

RFC assessment." Helms v. Berryhill, No. 3:16-CV-189 (MHL), 2017 WL 3038154, at *8 (E.D. Va. June 30, 2017), adopted by 2017 WL 3032216 (E.D. Va. July 17, 2017). (Id.) "Courts have held claimants to a high burden in supplying the appropriate documentation." Id. (citing cases). (Id.)

The pertinent case law is persuasive and on point with the case *sub judice*. Although Claimant has demonstrated that her treatment providers prescribed hand-held assistive devices, she has provided no additional explanations for these prescriptions as required under SSR 96-9p that merit a finding that they were "medically required." In addition, given the litany of the pertinent legal authority from the collection of cases that have previously considered this precise issue, there is no evidence that the ALJ substituted his own lay opinion in finding that Claimant's use of a cane or walker was not medically required.

The Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Ultimately, it is the responsibility of the Commissioner, not the court, to review the case, make findings of fact, and to resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

The undersigned also notes that the ALJ provided an appropriate and thorough explanation for giving little weight to Claimant's treating source opinions regarding her physical impairments, particularly with respect to her use of a cane or walker, as provided under Fourth Circuit jurisprudence. Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986); Hammond v. Heckler, 765 F.2d 424 (4th Cir. 1985). Though Claimant also asserts that the ALJ "rejected" Dr. Sayre's opinion that Claimant required the use of hand-held assistive devices (Document No. 17 at 9.), however, as noted *supra*, other than prescriptions, the record contains no "medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, **and** describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)" as governed by SSR 96-9p. Furthermore, pursuant to Sections 404.1527(a)(2) and 416.927(a)(2),

> Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your symptoms, diagnosis and prognosis, what you can still do despite your impairment(s), and your physical or mental restrictions.

It is clear that Dr. Sayre's prescription for the wheeled walker (Tr. at 710.) would not constitute a "medical opinion" as defined above. Based on the ALJ's acknowledgement of Claimant's prescriptions, testimony, and medical records concerning her use of assistive devices, it is clear that the ALJ did not "reject" Claimant's use of them, but only considered whether they were "medically required." Accordingly, the undersigned finds this argument lacks merit. Nevertheless, it is important to recognize that Dr. Kureshi's and Dr. Jefferson's opinions restricting Claimant's functional capabilities in lifting/carrying, walking/standing, and sitting in an eight-hour workday is a "residual functional capacity . . . or the application of vocational factors", an issue solely reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Moreover,

pursuant to Sections 404.1527(d)(3) and 416.1527(d)(3), the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." Accordingly, the ALJ provided "good reasons" for giving those opinions little weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

The resulting RFC assessment concerning Claimant's physical impairments, specifically with regard to her use of a cane or a walker, included the required narrative discussion that allows for meaningful judicial review and with respect to the findings of fact and conclusions provided in the written decision. It is clear that the ALJ complied with the mandate to "build an accurate and logical bridge from the evidence to his conclusion." Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)).

Finally, based on the little weight assigned to the opinion evidence, particularly with respect to the postural limitations in an eight-hour period, or Claimant's use of a cane or walker, the ALJ was not duty bound to pose a hypothetical question to the VE including those limitations. Hypothetical questions need only incorporate those limitations that an ALJ accepts as credible and that are supported by the record. See Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). As stated above, the reconciliation of conflicting evidence was for the ALJ to resolve, not this Court. See SSR 96-8p, 1996 WL 3741784, at *7.

In sum, the undersigned **FINDS** that the ALJ's RFC assessment is supported by substantial evidence, and that his evaluation of the opinion evidence was appropriate and compliant with the applicable Regulations, Social Security Rulings, and legal precedent.

The Credibility Analysis:

Claimant's next argument concerns her assertion that the ALJ failed to follow the requirements under 20 C.F.R. §§ 404.1529 and 416.929, SSR 96-7p, and SSR 96-4p in evaluating Claimant's credibility regarding her subjective complaints, specifically because the ALJ relied almost entirely on the objective medical evidence, and provided an inadequate consideration to Claimant's medication side effects and daily activities. (Document No. 17 at 15.) Social Security Ruling 96-7p[7] clarifies the evaluation of symptoms, including pain: 20 C.F.R. §§ 404.1529, 416.929 require a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements. See, also, Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985).

The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities,

---

[7] The undersigned is aware that this Ruling has been superseded by SSR 16-3p, effective March 28, 2016, however, the former Ruling applies to the ALJ's decision herein, having been issued on December 23, 2015. See, SSR 16-3p, 2016 WL 1131509.

and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

As an initial matter, it is well known that credibility determinations are properly within the province of the adjudicator and beyond the scope of judicial review. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Davis v. Colvin, 3:13-CV-23399, 2015 WL 5686896, at *7 (S.D.W. Va. Sept. 8, 2015) ("The credibility determinations of an administrative judge are virtually unreviewable on appeal.")

With respect to Claimant's activities of daily living, the ALJ found her limitations were mild, noting that she fed, watered, and played with her cat[;] could drive and go out alone; could prepare her own meals; did light housekeeping, which included dusting, laundry and washing dishes. (Tr. at 24.) In addition to her alleged daily activities, the ALJ acknowledged that Claimant told Prestera Center providers of being estranged from her third husband and two adult children, and that she did not like to be in a crowd. (Id.) However, the ALJ also noted that Claimant also reported that she went to the grocery store, got along "good" with authority figures, that she went to church once or twice a week, and she had four close friendships. (Id.)

After properly performing the two-step process[8], the ALJ proceeded to review the other evidence of record and reconciled it with Claimant's statements concerning the intensity, persistence and limiting effects of her symptoms, beginning with her testimony about being anxious in a crowd and "would rather stay home" as well as her difficulties using the foot controls when driving. (Tr. at 26.) The ALJ acknowledged Claimant's statements that she could sit for about ten minutes and that she could stand or walk for about five minutes before she would need

---

[8] See, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

to sit down. (Id.) As noted *supra*, the ALJ considered Claimant's testimony regarding her use of a cane for two years to help her with her balance and that Medicaid paid for it. (Id.) The ALJ further noted "about one year ago, she qualified for home health services and her ex-daughter-in-law comes to her house five days a week to help with chores." (Id.)

With regard to the other facts to consider pursuant to the pertinent legal authorities, *supra*, the ALJ considered Claimant's assertion that she takes Neurontin "and does not know if her fatigue is related to it. She stated she feels sleepy and nauseous." (Id.) The ALJ noted that the medical evidence did not support Claimant's allegations, first citing her amended alleged onset date of July 4, 2012 and contrasting it with a medical record dated July 5, 2012 from Sarah Kureshi, M.D. wherein Claimant "reported she was thinking about joining a sports team for fitness class." (Id.) The ALJ further acknowledged that Dr. Kureshi "encouraged the claimant to be more active and lose weight." (Id.) Dr. Kureshi's treatment notes further describe that on March 26, 2013, Claimant was feeling well and taking her medication daily, whereas the prior month she had only been taking her medication intermittently. (Id.) The ALJ noted that Dr. Kureshi's record show that in April 2013, May 2013, and June 2013 that Claimant continued to do well, and continued to encourage her to lose weight, and that Claimant reported walking three to four days for exercise. (Tr. at 26-27.)

Notably, the ALJ reconciled this information and found them to be "inconsistent with the severity of limitations alleged during testimony by the claimant, particularly requirement of a cane or walker for ambulation." (Tr. at 27.) The ALJ further noted Dr. Parsley's consultation report that Claimant presented using a cane, but Dr. Parsley "indicated that the claimant was able to ambulate without using the cane." (Id.) The ALJ then reviewed the objective medical evidence of record,

ultimately determining that it did not support Claimant's allegations of greater physical limitations. (Tr. at 27-28.)

Turning to Claimant's mental impairments, the ALJ expressly considered the entire medical record of evidence, beginning with her September 23, 2013 visit to Dr. Kureshi reporting a depressed mood, "because she found out two weeks ago that her husband had been cheating on her", and that she wanted to move back home to be with her family and friends. (Tr. at 28.) On December 23, 2013, Claimant reported "off and on" depressive symptoms for several years to consultative psychological evaluator Angela Null, though Claimant had no prior mental health treatment, and Ms. Null's findings were otherwise unremarkable. (Id.) Finally, the ALJ noted that "numerous records subsequent to the consultative evaluation consistently revealed she had appropriate mood, even as recently as July 22, 2015." (Id.) Nevertheless, despite the "little mental health evidence", the ALJ considered Claimant's allegations regarding her social interactions, limited her to only occasional interaction with the public. (Id.) Again, the ALJ determined that Claimant's activities of daily living indicated that she functioned at a higher level both physically and psychologically than she alleged. (Tr. at 28-29.)

In sum, contrary to Claimant's argument otherwise, the ALJ's credibility analysis was not "almost entirely" reliant upon the objective medical evidence, the lack of certain evidence was noted and considered, and further, the ALJ's consideration of Claimant's side effects from medications and her daily activities were not mere "pretense." Accordingly, the undersigned **FINDS** the ALJ's assessment of Claimant's credibility complied with the Regulations and is based upon substantial evidence.

Finally, the undersigned **FINDS** ALJ's decision finding Claimant was not disabled is based upon substantial evidence.

**<u>Recommendations for Disposition</u>**

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for judgment on the pleadings (Document No. 17.), **GRANT** the Defendant's request to affirm the decision below (Document No. 20.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), <u>reh'g denied</u>, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); <u>Wright v. Collins</u>, 766 F.2d 841 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d

91, 94 (4th Cir.), <u>cert. denied</u>, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Goodwin, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: October 4, 2017.

Omar J. Aboulhosn
United States Magistrate Judge